Filed 1/5/21  P. v. Herr CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073223 |
| v. | (Super.Ct.No. FVI1300363) |
| SCOTT DAVID HERR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Charles J. Umeda, Judge.  Affirmed with directions.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant Scott David Herr of first degree murder for strangling Sue Paynter (Paynter) to death in 1994. The crime was not solved until 2013, when DNA extracted from semen found on the victim's clothing was found to be a match to defendant's DNA profile. On appeal, defendant principally argues (1) the trial court erred prejudicially by admitting evidence he strangled but did not kill Jane Doe (Doe) in Arizona in 1995, and (2) there is no substantial evidence the murder of Paynter was willful, deliberate, and premeditated. Defendant also argues, and the People concede, that (1) the trial court erred by imposing a parole revocation restitution fine under a statute that was not enacted until after his offense, (2) the trial court applied the wrong statute when calculating defendant's presentence custody credits, and (3) the abstract of judgment must be corrected to eliminate confusion about defendant's sentence.

We agree with the People's concessions, correct the judgment appropriately, and direct the superior court clerk to prepare an amended abstract of judgment. In all other respects, the judgment is affirmed.

I.

PROCEDURAL BACKGROUND

A jury found defendant guilty on the sole count of first degree murder. (Pen. Code, § 187, subd. (a).) The trial court sentenced defendant to state prison for 25 years to life and awarded him 3,122 days of presentence credit toward his sentence (2,342 days in presentence custody plus 780 days of conduct credit). And, relevant here, the court ordered defendant to pay a $350 restitution fine and a $350 parole revocation restitution fine but stayed the latter pending successful completion of parole.

2

## II.

## FACTS

A.      *1994: Discovery of Paynter's Body and the Initial Investigation.*

According to testimony from Paynter's daughter, in 1994, Paynter was a heroin addict who prostituted herself mostly at truck stops in Bakersfield. The last time she was seen by her daughter was either March 29 or 30. Paynter told her daughter she was going to travel to Sacramento with a truck driver, but she would be back "three to four days before Easter." Paynter packed some clothing and makeup. Her daughter testified that Paynter owned a pair of pink shorts and a plaid, pink, flannel shirt.

On the morning of April 1, 1994, a man was driving home from work when he pulled to the side of the road in an undeveloped area. The area where he stopped was dark and unlit, but he could see in the moonlight. As he stopped, the man saw a newer model tractor-trailer truck with a sleeping cabin pull away from the side of the roadway and drive past him. He did not see the driver's face or notice the color of the truck, and he could not remember the make of the truck. The man got out of his vehicle and walked about five feet into the bushes to relieve himself. He saw a pair of legs sticking out from the bushes about 20 feet away and, when he walked over to the bushes, he saw a body. The man drove to the Adelanto police station to report what he had seen.

Police officers responded to where the body had been found. The desert area was secluded and off a dirt road, about one mile from some industrial buildings. About 30 feet from the road, the officers found the body of a woman, laying on her right side, "by a large bush or brush." The woman had discoloration in her face and lower back, and she was cold to the touch. She was barefoot and wearing a pair of light pink shorts, a mauve shirt that was tucked into the shorts but pulled up in the back, and a flannel shirt. Her bra was unfastened. When the coroner arrived and turned over the body, the officers saw that her shorts were also unbuttoned and her underwear was torn on one side. Fresh tire tracks discovered in a "turn-around-type area" not far from the body were consistent with a large tractor-trailer truck.

During a postmortem examination, a pathologist observed that the woman's eyes were very congested with blood, and she had petechial hemorrhages in her eyelids. She also had a small abrasion on her nose and a number of bruises or abrasions on her legs. There was bruising and redness on her neck. An internal examination of her neck revealed hemorrhaging in the tissue of the larynx and the airway. The pathologist opined the cause of death was manual strangulation, and the assailant had strangled the woman for three to four minutes and applied at least "four [to] five pounds" of pressure "per square inch" to her neck. A sexual assault examination revealed no signs of trauma to the vagina or rectum, but the pathologist testified that the results did not mean the woman had not had sex before she died. The woman's blood tested positive for the presence of cocaine and opiates, probably from heroin.

4

B.    *1995: Defendant's Strangulation of Doe in Arizona.*

Doe testified she was a club manager, stripper, and prostitute in Phoenix, Arizona. On November 20, 1995, while she was hitchhiking, defendant stopped his newer model semitruck and spoke to her. Doe testified that she was not prostituting herself at the time, but she did need a ride. Doe got into defendant's truck, and they drove for a couple of miles to an empty cul-de-sac in an industrial area. Defendant, who was bigger than her, moved her into the sleeping cab of the truck, bound her with duct tape, and gagged her with "a rolled up dirty sock." He threatened her and said he was going to kill her.

Defendant then drove Doe to an unimproved desert area, about 45 miles away. He brutalized and tortured her over a seven-hour period. He raped her, both vaginally and anally, but ejaculated on himself. While raping her, defendant put his hands around her neck and strangled her until she passed out. She tried to resist and had to fight to breathe. When she came to, he once again strangled her until she passed out. He repeated this at least one more time. All the while, defendant threatened to kill her. She did not beg for her life because she was gagged. After strangling Doe a third time, defendant "cut [her] loose" and "dumped [her] out" at her "sponsor's house," which was near the area she originally had been hitchhiking.

C.    *2012-2014: DNA Analysis of Paynter's Shorts and Further Investigation.*

In 1994, Paynter's clothing was screened for biological evidence, and semen was discovered on her pink shorts. Because the laboratory was not equipped to conduct DNA testing at the time, the sections of material where the semen was discovered were cut out so they could be frozen and preserved for future testing.

5

In 2012, DNA testing was performed on two of the cuttings from the shorts, which revealed DNA from Paynter and an unknown male. In January 2013, the DNA profile for the male was confirmed to be a match to defendant's DNA profile on CODIS.[1]

After receiving the results of the match on CODIS, detectives traveled to Phoenix in January 2014 to interview defendant. Defendant told the detectives he had worked as a truck driver in 1994, and he drove all over the United States and Canada in a brand new Volvo tractor-trailer truck, which also had a sleeping cabin. He said he had been married once, for about a month, and currently did not have a girlfriend. Defendant told the detectives he had "extremely dark" fantasies about raping and torturing prostitutes. He said when he was about 19 years old, a prostitute in a "porn shop" offered to perform oral sex on him for $5. While performing the act in a dark room, the prostitute stole $400 from his wallet. After that experience, defendant's fantasies focused on prostitutes.

When discussing his fantasies, defendant said he thought he could get away with raping and killing prostitutes because "nobody would really care, you know, it's not really a woman, it's just a prostitute, and I had a lot of distorted thinking." Part of his fantasy was to overpower the prostitutes because of his size and take away their ability to say, "no," to him. Defendant's fantasies involved having sex with the prostitutes, then torturing and strangling them "to raise the ante" and "get the intensity higher" so he could masturbate and ejaculate. Part of the arousal for defendant in his fantasies was for the

---

[1] CODIS, an acronym for Combined DNA Index System, is "a nationwide database that enables law enforcement to search DNA profiles collected from federal, state, and local collection programs." (*People v. Buza* (2018) 4 Cal.5th 658, 666.)

prostitute to be "scared" and timid. In his fantasies, defendant strangled the prostitutes with his bare hands from the front, instead of with a rope, because it would not be messy. And after killing the prostitutes, he planned to bury them.

Defendant told the detectives that while he was driving a truck, he would pick up prostitutes from truck stops and rest areas "all over," and he had vaginal, anal, and oral sex with them. He was aroused by their naked bodies, but he said that to ejaculate he had "to sit there and fantasize about rape or whatever." Defendant said that, while driving from Texas to Phoenix, he started thinking about picking up a prostitute to see if he could rape and torture her. When he arrived in Phoenix, "the fantasy kinda looked like it was more and more real."

Defendant picked up Doe because she looked like someone he could overpower. He drove her to an industrial area and paid her for sex. They got undressed and moved into the sleeper cabin. He said that, while "having consensual sex" with her, he tried to convince himself "to change it up from this to rape," and finally he "talked [him]self into it." Defendant told Doe to put her hands behind her back and "do as you're told [and] you won't get hurt." Using duct tape he "bought specifically for this," he bound her hands and ankles and gagged her.

Defendant "expected fear" as part of the fantasy, but he "couldn't get off on that because . . . [Doe] wasn't scared." He had anal sex with her and said he was going to torture and kill her, but he got "no reaction." He became frustrated because she was "extremely compliant" and did not react with fear, as he wanted. He then tried to strangle her from the front but stopped because she did not have the look of fear in her eyes, and

7

his hands started to cramp up. Defendant told the detectives, "It wasn't doing it for me," and "I . . . realized . . . I can't do this." Had Doe shown fear, defendant believed he "would have followed right through with all [his] fantasies." When asked if that meant he would have killed her, he replied, "I believe so." Defendant untied Doe, apologized and offered to pay for any medical bills, and drove her home. He drove as far as the California border but decided to turn himself in to the police.

When asked by detectives if he had tried to act out his fantasies before the incident with Doe, defendant said, "there [were] a couple start and stops." He picked up a prostitute at a rest stop in Tulare and another in Stockton. He told them "something's gonna happen," but then realized he could not go through with it and played it off "like it's a joke." The detectives asked him if some of his fantasies had become a reality with a woman in the Barstow area, but he replied, "Not that I know of."

Defendant did not recognize Paynter from a photograph he was shown and said he had no idea if he had ever seen her before. When told there was physical evidence connecting him to her murder and his DNA was found on her, defendant denied knowing anything about it. He denied that he might have blurred the lines between fantasy and reality, saying, "I think I would know if I killed somebody." The detectives did not portray Paynter as a prostitute in order to humanize her and make defendant feel guilty. Defendant said he had been with prostitutes "all over the place," and "[n]obody else would give [him] the time of day." When asked if he denied having "any type of sexual relationship with [Paynter] at all," defendant replied, "I have no idea" and "she's not familiar." He had no explanation of why his DNA was found on Paynter's shorts. But,

8

when one of the detectives said, "we know that you had sexual relations with her," defendant replied, "Okay then, she obviously [was] the prostitute[] that I was with over there."

III.

DISCUSSION

A.    *The Trial Court Correctly Admitted Evidence of Defendant's Uncharged Conduct to Prove Intent and Motive.*

Defendant argues that the trial court erred prejudicially by admitting evidence of his rape and strangulation of Doe.  We find no abuse of discretion and, if there was error, it was harmless.

1.    *Additional background.*

At a hearing on competing motions about the admissibility of defendant's 1995 acts against Doe, the prosecutor argued the uncharged conduct was relevant and admissible under Evidence Code section 1101, subdivision (b) (hereafter § 1101(b)) to prove defendant intended to kill in the current case, and it was not excludable pursuant to Evidence Code section 352.  According to the prosecutor, when defendant was interviewed in 2013, he told investigators about his fantasy of killing a prostitute, "and one of the key components [of that fantasy] is the victim needs to beg for her life in order for him to complete the murder."  Defendant did not kill Doe because she did not beg for her life so, the prosecutor argued, "we can infer from those actions that the victim in the current case must have begged and pleaded for her life because she did die of strangulation."  Defendant told Doe (and later investigators) that he intended to kill her,

9

but he did not do so because "she didn't fulfill his fantasies." The prosecutor also argued that the evidence was admissible to prove motive. The defendant told investigators that his fantasies involved killing prostitutes because they would not be missed, and he strangled them with his hands "because it's not messy." Defendant strangled both Paynter and Doe but said he did not kill Doe because she was "compliant and let[] him hurt her." Finally, the prosecutor argued that the evidence was admissible to prove a "common plan or design."

Defense counsel argued the facts of the 1995 assault on Doe and the 1994 murder of Paynter were so different that it would be irrational to conclude the same assailant was responsible for both cases. Defendant sexually assaulted Doe repeatedly, but there was no evidence of sexual intercourse with Paynter. Defendant tortured and brutalized Doe but, besides the strangulation, Paynter was not beaten. And, although defendant told Doe and investigators that he intended to kill her, and he repeatedly strangled her, he did not kill her. Moreover, defense counsel argued there was no practical reason to introduce uncharged conduct in order to prove an intent to kill Paynter because premeditation or at least reckless disregard for human life could be inferred from the strangulation itself. He also argued the evidence did not prove motive because, other than the fact Paynter was strangled, there was no evidence she was murdered to fulfill a fantasy, and the evidence was not sufficient to prove a common plan or scheme. Finally, counsel argued the evidence was more inflammatory than probative and should be excluded under Evidence Code section 352.

The trial court found there were enough similarities between defendant's assault on Doe and the murder of Paynter to support the admission of the uncharged conduct to prove intent and motive. However, the court limited the scope of the evidence the prosecutor could admit to evidence that (1) defendant picked up Doe and drove her to an industrial area, (2) he told her he would have sex with her whether she was a prostitute or not, (3) he "duct taped her mouth" and had vaginal and anal sex with her numerous times, but only ejaculated on himself, (4) he threatened to kill her, and (5) he strangled her three times from the front with both hands until she passed out, but ultimately said he could not kill her. The court ruled the prosecutor could not elicit testimony about "other details" of the assault, including that defendant gouged Doe's eye, bent her finger back until it broke, and hit her with a hammer. In addition, the court ruled the evidence was not admissible to prove "common plan or scheme."

Following his conviction, defendant moved for a new trial contending the testimony about his assault and strangulation of Doe was "shocking in its nature" and violated his right to a fair trial. The trial court once more found the probative value of the evidence outweighed its prejudicial impact and denied the motion.

   2.  *Applicable law.*

"Only relevant evidence is admissible (Evid. Code, §§ 210, 350), 'and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).).)' [Citation.] 'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable

11

inference" to establish material facts such as identity, intent, or motive.'" (*People v. Harris* (2005) 37 Cal.4th 310, 337.)

Evidence Code section 1101, subdivision (a), generally prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, "to prove his or her conduct on a specified occasion." Section 1101(b) clarifies, however, that this rule does not prohibit the admission of evidence of uncharged misconduct when it is relevant to establish some fact other than the person's disposition to commit such an act, such as motive, intent, and absence of mistake or accident.

""""[T]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."""" (*People v. Fayed* (2020) 9 Cal.5th 147, 191.) "The conduct may also have occurred after the charged events, so long as the other requirements for admissibility are met." (*People v. Leon* (2015) 61 Cal.4th 569, 597.)

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that

12

the defendant "'probably harbor[ed] the same intent in each instance.'"" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

"'[T]he probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus.'" (*People v. Fayed*, *supra*, 9 Cal.5th at p. 191.) There must be sufficient evidence showing in each instance the defendant acted with the same motive. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1097.)

"The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) "[E]vidence of uncharged misconduct "'is so prejudicial that its admission requires extremely careful analysis"'" under Evidence Code section 352. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

""'"Rulings made under [Evidence Code sections 1101 and 352 . . .] are reviewed for an abuse of discretion. [Citation.]" [Citation.] "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd

manner that resulted in a manifest miscarriage of justice.'"'"'" (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)

> 3. *Analysis.*

Defendant argues the trial court should not have admitted evidence of the assault on Doe in order to prove an intent to kill Paynter because "it could not be disputed that the killer intended to kill." But, because defendant pleaded not guilty, the prosecutor was required to affirmatively prove every element of the offense of first degree murder beyond a reasonable doubt, including the intent to kill. (Pen. Code, § 1019; *People v. Walker* (2006) 139 Cal.App.4th 782, 796.)

In addition, defendant argues the charged offense and the uncharged conduct "were not sufficiently similar" to warrant admitting the uncharged conduct to prove intent. True, there were distinct points of dissimilarity between the incidents, most importantly that Paynter was murdered while Doe was not, and Doe was bound and gagged, but there was no evidence Paynter was. But, the similarities were significant. Both were prostitutes, although Doe testified she was not working when defendant picked her up. Paynter's assailant engaged in some form of sex with her, though not to the same extent that defendant had with Doe. In both instances, the assailant ejaculated outside the victim's body. There is circumstantial evidence from which a jury could conclude Paynter was taken by her assailant somewhere remote before, during, and after her murder, and Doe expressly testified that defendant had driven her to a remote location where he raped and strangled her. And both victims were manually strangled from the front. Defendant told the detectives he did not kill Doe because he was unable to

14

provoke fear in her, but he probably would have killed her had she begged for her life and shown fear. Therefore, we conclude the charged and uncharged conduct was "sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance."'" (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402; see *People v. Walker*, *supra*, 139 Cal.App.4th at p. 805 [fact prior victim was not murdered "does not negate the similarity of the two incidents"].)

As he does with respect to intent, defendant argues the uncharged conduct was also cumulative with respect to the question of motive. For that reason, he contends the evidence was highly prejudicial and should have been excluded under Evidence Code section 352. Defendant is correct that evidence of what happened to Doe was inflammatory. But, the analysis under section 352 requires a comparison between the inflammatory nature of the uncharged conduct and that of the charged offense. "The potential for . . . prejudice is 'decreased' when testimony describing the defendant's uncharged acts is 'no stronger and no more inflammatory than the testimony concerning the charged offenses.'" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144, quoting *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.) Though indisputably horrifying, the evidence of what defendant did to Doe was certainly no more and perhaps less inflammatory than the fate that ultimately befell Paynter, who was murdered and left on the side of the road.

Finally, even if we were to agree with defendant that the trial court abused its discretion by admitting the uncharged conduct, we cannot reverse the judgment unless we conclude the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).) Erroneous admission of uncharged conduct under

15

section 1101(b) is harmless if "it is not reasonably probable that a result more favorable to defendant would have resulted absent admission of [the] evidence." (*People v. Welch* (1999) 20 Cal.4th 701, 750, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Even without the evidence of defendant's rape and strangulation of Doe, the prosecution introduced strong direct and circumstantial evidence that defendant murdered Paynter. During his interview, defendant described in great detail his "fantasy" of raping and strangling prostitutes, and he articulated his motive for having such a fantasy. He operated a new tractor-trailer truck, with a sleeping cabin, at the time of the murder, and it was consistent with the truck observed by the man who found Paynter's body and consistent with the tire tracks found nearby. Defendant admitted he picked up prostitutes "all over" in truck stops and rest areas. According to her daughter, Paynter did work as a prostitute, mostly at truck stops. And, the state of undress in which her body was found, the semen stains found on her shorts that contained defendant's DNA, and the cause of her death were all consistent with defendant's fantasy of strangling prostitutes to death while engaged in sex acts to elicit a fear response so he could masturbate and ejaculate.

Therefore, even if the trial court erred by admitting evidence of the uncharged conduct, defendant was not prejudiced.

B.     *Substantial Evidence Supports Defendant's Conviction for First Degree Murder.*

Defendant argues the prosecutor presented no evidence that the murder by asphyxiation was deliberate and premeditated, and the mere fact Paynter died by manual strangulation is not enough to support the inference of a deliberate and premeditated act.

16

Therefore, he contends the conviction must be reduced to second degree murder. We disagree.

        1.    *Applicable law.*

"Where, as here, a defendant challenges the sufficiency of the evidence on appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] A reviewing court must reverse a conviction where the record provides no discernible support for the verdict even when viewed in the light most favorable to the judgment below. [Citation.] Nonetheless, it is the jury, not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt. [Citation.] And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment." (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)

Murder is the unlawful killing of a human being or fetus with malice aforethought. (Pen. Code, § 187, subd. (a).) Malice may be express or implied. (Pen. Code, former

§ 188, 1st par.)[2] Express malice means "a deliberate intention unlawfully to take away the life of a fellow creature." (*Ibid.*) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*) An unlawful killing with express malice, such as a "willful, deliberate, and premeditated killing," is first degree murder. (Pen. Code, former § 189, 1st par.) An unlawful killing with implied malice is second degree murder. (*Ibid.*)

To prove a killing was willful, deliberate, and premeditated, the prosecutor is not required to prove the defendant "maturely and meaningfully reflected upon the gravity of his or her act." (Pen. Code, former § 189, 4th par.) "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] The reflection may be arrived at quickly; it need not span a specific or extended period of time." (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355.)

A killing is willful if it is done intentionally. (*People v. Delgado* (2017) 2 Cal.5th 544, 571; *People v. Moon* (2005) 37 Cal.4th 1, 29; see Pen. Code, § 7, subd. (1) ["The word 'willfully,' when applied to the intent with which an act is done or omitted, implies

_____

**2** Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended Penal Code sections 188 and 189 (Stats. 2018, ch. 1015, §§ 2, 3) to separate their previously unnumbered paragraphs "into sequential subdivisions and subsections." (*People v. Prado* (2020) 49 Cal.App.5th 480, 488, fns. 5, 6.) The substantive amendments made to those sections by Senate Bill No. 1437 have no bearing here. For the sake of clarity, we will cite to and quote from Penal Code former sections 188 and 189 as they read on the date of defendant's offense. (See Cal. Style Manual (4th ed. 2000) § 2:7, pp. 50-51 ["If a section or subdivision has several unnumbered or unlettered paragraphs, specific paragraphs should be referenced."].)

simply a purpose or willingness to commit the act, or make the omission referred to."].)

Direct evidence of intent is rarely available, but intent to kill may be inferred from the circumstances of the crime and a defendant's actions. (*People v. Sánchez* (2016) 63 Cal.4th 411, 457.)

With respect to premeditation and deliberation, our Supreme Court has identified three categories of evidence to consider: planning activity, motive, and the manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) When the record contains evidence in all three categories, the verdict is generally affirmed. (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) But those categories or factors are not exclusive or determinative—they are merely intended to guide a reviewing court's assessment of whether the evidence supports a reasonable inference that the killing was the result of the defendant's preexisting reflection and not the result of an unconsidered or rash impulse. (*People v. Cage* (2015) 62 Cal.4th 256, 276.) "[C]onvictions for first degree murder typically have been upheld where there is '"either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing."'" (*People v. Proctor* (1992) 4 Cal.4th 499, 529.)

2.    *Analysis.*

As the People contend, the manner of killing in this case strongly supports the inference that the murder by manual strangulation was deliberate and premeditated.[3] "[C]ase law holds that killing a victim by strangulation shows the type of premeditation

---

[3] As stated, *ante,* defendant does not argue the evidence failed to establish the murder was intentional, as opposed to accidental.

and deliberation necessary to support a conviction for first degree murder." (*People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1064.)

In *People v. Hovarter* (2008) 44 Cal.4th 983, the victim was strangled with a rope, and it took between five and eight minutes for her to die. (*Id.* at pp. 1019-1020.) The court held: "This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act." (*Id.* at p. 1020.) The defendant in *People v. Stitely*, *supra*, 35 Cal.4th 514 applied "lethal pressure" to the victim's neck for a "'long' time." (*Id.* at p. 544.) The court held: "This evidence suggests defendant had ample opportunity to consider the deadly consequences of his actions." (*Ibid.*) And in *People v. Davis* (1995) 10 Cal.4th 463, the defendant strangled a woman for as long as five minutes after she had suffered internal injuries during a car accident. (*Id.* at p. 510.) The Supreme Court held the jury could reasonably infer the defendant premeditated and deliberated before killing the victim. (*Ibid.*)

As indicated, *ante*, a pathologist testified that the hemorrhaging found in Paynter's eyes and internal neck and airway tissues was consistent with manual strangulation from the front. When asked how long the strangulation would have lasted, he answered, "about three to four minutes and that's assumed it's being sustained the whole time with no breaks, so to speak." He further explained: "[I]n order to cause damage to the brain that's irreversible, it takes somewhere in the order of three to four minutes because the brain cannot survive being deprived of adequate oxygenation for more than that." And when asked how much pressure had to have been applied to Paynter's neck, he testified it

20

would have been "four, five pounds, at the minimum, per square inch and upwards from there." From the evidence that defendant applied significant force to Paynter's neck for a "prolonged period of time, a rational juror could find that [he] committed a premeditated and deliberate murder." (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 11.)

Relying on *People v. Rowland* (1982) 134 Cal.App.3d 1, defendant argues, "Strangling a person does not by itself indicate a preconceived design to kill." This court found *Rowland* to be unpersuasive in a case where the evidence showed the defendant strangled his victim for one to five minutes, during which he applied 15 to 30 pounds of pressure to her throat. (*People v. Shamblin*, *supra*, 236 Cal.App.4th at pp. 11-12.) "*Rowland* is a case where the court found, on the limited evidence in the record, that the mere fact that the victim was strangled with an electric cord was insufficient to support a finding of premeditation and deliberation. [Citation.] Since *Rowland*, the California Supreme Court has held that strangulation that takes place over several minutes affords the killer ample time to think over the consequences of his action. [Citations.] Not only did *Rowland* predate this precedent, but also it is a case where there was no expert testimony about the length of time it took to kill the victim or about the extent of the victim's injuries. For these reasons *Rowland* does not affect our conclusion that the evidence in this case supports a finding of prolonged strangulation and, as a result, premeditation and deliberation." (*Shamblin*, at p. 12; see *People v. Disa* (2016) 1 Cal.App.5th 654, 667-668 [distinguishing *Rowland* in a case where "there was significant additional evidence regarding the manner of killing . . . absent from *Rowland*"].)

So too here. Whereas in *Rowland* the reviewing court had no evidence before it about the duration of the strangulation or the amount of force applied to the victim's neck, here the jury heard evidence that defendant would have had to have strangled Paynter for three to four minutes with no break, while applying at least "four [to] five pounds" of pressure "per square inch" to her neck in order to kill her.

Finally, we agree with the People that strong evidence of defendant's motivation for the killing, and somewhat weaker evidence of planning activity, also supports the jury's finding that the murder was deliberate and premeditated. During his interview with detectives, defendant described in significant detail his fantasy of raping and killing prostitutes. He singled out prostitutes because of the negative experience he had with one when he was around 19 years old and because he believed they were not real women and would not be missed. Defendant said prostitutes' naked bodies, and the sex acts themselves, were not enough for him to achieve climax. Instead, he needed to fantasize about threatening, then strangling, the women to instill terror and timidity for him to increase the intensity of the act. From the state of Paynter's clothing—unfastened bra, unbuttoned shorts, shirt pulled up in the back, and torn underwear on one side—and defendant's semen discovered on her shorts, the jury could reasonably have concluded defendant had at least some limited sexual contact with her, during which he acted out his strangulation fantasy and achieved the desired fear response he needed so he could masturbate and ejaculate. And from the circumstantial evidence that defendant left her body on the side of the road in an undeveloped part of Adelanto, a newer truck similar to

22

defendant's was seen driving off, and consistent tire treads were found near her body, a reasonable jury could infer defendant planned out the murder to some degree.

In sum, we conclude there is substantial evidence in the record to support the jury's finding that the murder was deliberate and premeditated.

C.       *Sentencing Errors*.

Defendant contends, and the People mostly concede, that certain errors at sentencing must be corrected.

First, defendant contends the trial court erred by imposing a $350 parole revocation restitution fine because the statute mandating such a fine was not enacted until 1995, one year after his offense.  (Pen. Code, § 1202.45, as enacted by Stats. 1995, ch. 313, § 6, eff. Aug. 3, 1995.)  "The United States Constitution states:  'No state shall . . . pass any . . . ex post facto law . . . .'  (U.S. Const., art. I, § 10, cl. 1.)  The California Constitution also provides that an 'ex post facto law . . . may not be passed.'  (Cal. Const., art. I, § 9.)  Our California provision provides the same protections and is analyzed in the same manner as the federal provision."  (*In re Vicks* (2013) 56 Cal.4th 274, 287.)  "The purpose of the ex post facto doctrine is to ensure fair notice of the conduct that constitutes a crime and of the punishment that may be imposed for a crime.  [Citation.]  Therefore, it is 'aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts."'"  (*Ibid*., fn. omitted.)  The People concede that imposition of the later enacted parole revocation restitution fine on defendant violates the ex post facto clauses, and it must be stricken.  (*People v. Callejas* (2000) 85 Cal.App.4th 667, 676-678 [so holding].)  We agree and strike the fee.

Next, defendant argues the trial court violated the ex post facto clauses when it calculated his presentence conduct credits pursuant to Penal Code section 2933.1, a statute that did not become effective until five months after his offense. (Stats. 1994, ch. 713, § 1, eff. Sept. 21, 1994.) But as the People assert in their brief, although the minute order and abstract of judgment purport to indicate the court calculated conduct credits under section 2933.1, the transcript of oral proceedings expressly states the court "computed [conduct credits] pursuant to Penal Code section 2931." When the minutes and abstract of judgment conflict with the oral pronouncement of sentence, the latter must generally prevail. (*People v. Leon* (2020) 8 Cal.5th 831, 855.)

In any event, the People concede the trial court erred by applying Penal Code section 2931 because that section governs postsentence good behavior credits awarded by the Department of Corrections and Rehabilitation. (*People v. Cooper* (2002) 27 Cal.4th 38, 40.) The People agree with defendant that the court should have calculated presentence conduct credits pursuant to Penal Code section 4019 (see *People v. Cooper*, at p. 47), which would have resulted in an award of 1,170 days of conduct credit instead of 780, for a total award of 3,512 days instead of 3,122.[4] We too agree and amend the judgment to award the correct sum of presentence credits.

---

[4] The arithmetic is: 2,342 (actual days in presentence custody) ÷ 4 = 585.5; 585 x 2 = 1,170; and 1,170 + 2,342 = 3,512. (See *People v. Culp* (2002) 100 Cal.App.4th 1278, 1283 [formula for calculating presentence credits under Pen. Code, § 4019].)

And last, defendant argues the abstract of judgment does not accurately reflect the trial court's oral pronouncement of a sentence of 25 years to life. The box on the abstract for a sentence of 25 years to life is correctly checked, but the box for a sentence of "LIFE WITH THE POSSIBILITY OF PAROLE" is also checked. The People contend the abstract is technically correct, but nonetheless concede it should be amended to avoid potential confusion. We conclude the abstract of judgment is both erroneous and potentially confusing, so we direct the clerk of the superior court to prepare an amended abstract that does not have the box checked for a sentence of life with the possibility of parole. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 823 [When a defendant is sentenced to 25 years to life, checking the boxes on the abstract of judgment for that sentence *and* for a sentence of life with the possibility of parole is "erroneous," "unnecessary and could be confusing."].)

## IV.

## DISPOSITION

The $350 parole revocation restitution fine imposed on defendant is hereby stricken. The award of presentence conduct credits to defendant is increased from 780 days to 1,170 days, for a total award of 3,512 days of presentence credit toward his sentence. The clerk of the superior court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation. The

25

amended abstract of judgment shall reflect that defendant was sentenced to 25 years to life but shall not reflect a sentence of life with the possibility of parole.

In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.

26